## PACIFIC PORTLAND CEMENT CO. v. WESTVACO CHLORINE PRODUCTS CORPORATION.

### No. 26934.

District Court, N. D. California, S. D.

May 3, 1948.

Pillsbury, Madison & Sutro, Eugene D. Bennett, Maurice D. L. Fuller and Wallace L. Kaapcke, all of San Francisco, Cal., for plaintiff.

Tadini Bacigalupi, Claude N. Rosenberg, and Bacigalupi, Elkus & Salinger, all of San Francisco, Cal., for defendant.

ROCHE, District Judge.

In this action for declaratory relief the court is asked to construe a certain contract for the sale of gypsum, with particular reference to Paragraphs (3), (5) and (6) thereof. Since Paragraph (6) [1], which contains the so-called "escalator price provision," presents the major disagreement, the court will devote the greater part of this discussion to that section of the contract.

The basic controversy between the parties is in the construction of the term "cost of production" as used in Paragraph (6). Plaintiff contends that it includes only the direct costs attributable to the production of gypsum and that price increases based on indirect as well as direct costs are not authorized by the contract. In this connection the complaint alleges, on information and belief, that certain payments, made under protest, were in excess of the price properly chargeable by the defendant under the contract.

Defendant makes two contentions: First, that the term "cost of production" is so indefinite as to render the contract void and second, in the event the court holds the contract valid, that the term should be construed to include not only direct costs but an allocation of indirect costs and general plant overhead.

The first question for decision is the validity of the contract and to determine this the court will look not only to the face of the contract but also to all attending circumstances, as disclosed by the evidence.

The original contracting parties were plaintiff and California Chemical Company, defendant's assignor. The record discloses that in 1936 California Chemical was contemplating building a sea water magnesia plant at Newark, California, located on San Francisco Bay, and expected to extract gypsum and bromine as well as magnesia. Because of the proximity of plaintiff's cement plant, California's then president, Stanley H. Barrows, approached James H. Colton, plaintiff's vice-president, and suggested that plaintiff might be interested in buying this contemplated output of gypsum. Colton was receptive and on June 5, 1936, Barrows wrote to Colton, outlining briefly a proposed basis for such an agreement. As thus outlined the agreement would have covered other products besides gypsum and would have contained certain price protection clauses to guard against increases in labor, fuel and supplies, as well as a cancellation privilege on the part of California. Further informal negotiations followed the receipt of this letter and on September 18, 1936, Barrows sent Colton a draft of the proposed contract. This, too, covered several products and the price protection clause was again based on increase in direct costs and a right of cancellation was given to California. Colton refused the cancellation clause and insisted plaintiff alone be given such right. Barrows testified that this stand of plaintiff made it necessary for him to protect

---

1 "(6) In the event that California's cost of production of gypsum for any twelve (12) months' period during the term hereof shall increase five per cent (5%) above its average cost of production of gypsum for the preceding twelve (12) months' period, then and in that event California shall have the right, upon giving sixty (60) days' written notice to Pacific, to increase the price payable hereunder for gypsum thereafter delivered hereunder in an amount not to exceed the actual advance in California's cost of manufacture; provided that in no event may more than one such increase be made in any one calendar year.

"California shall keep books of account and records showing its production cost of gypsum, and such books of account and records relating to the production cost of gypsum shall be open to inspection to Pacific at all reasonable times in order to enable Pacific to confirm the correctness of any advance in price permissible under this paragraph."

his company on the price and that he was no longer willing to limit cost to the items that had previously been enumerated. Further negotiation followed. Rather than attempting to enumerate all the items that might go to make up cost, the parties finally agreed on the term "cost of production" and that the cost records should be kept in accordance with proper and accepted accounting practice.

The formal contract, covering gypsum only, was signed on January 29, 1937, and was to run until January 31, 1962, subject, however, to cancellation by plaintiff at any time during the first two years, upon giving of written notice, and any time after the first two years upon giving of one year's written notice. Defendant Westvaco acquired California's rights almost immediately.

The record does not show what, if any, cost figures were utilized in fixing the basic contract price of $2.80 per ton. Only a pilot plant was in operation at that time, defendant's commercial plant having been constructed later. Sale of the gypsum continued at the contract price until August 4, 1941, when defendant notified plaintiff that there had been an 18 cent per ton increase in cost of manufacture and that, in accordance with the provisions of Paragraph (6), the price would be increased to $2.98 a ton. The record shows that early in October Colton and plaintiff's then accountant, one Canvin, visited defendant's plant for a conference to determine whether the $2.98 price was justified. While Colton was being shown over the plant, Canvin and defendant's accountant went over the figures. The following day defendant's chief accountant wrote plaintiff as follows:

"In accordance with request of yourself and J. H. Colton, while in conference with Mr. Wallace yesterday, we have analyzed gypsum production costs for the years ending June, 1940, and June, 1941. We are attaching hereto a recapitulation of labor, material and power costs which accounts for 15¢ per ton of the 18¢ per ton increase of which you have been previously notified, and which increase is effective October 5, 1941.

"If you desire further information in re the attached statement, or in connection with our basis of determining increase in cost, please call on the writer." (Emphasis the court's.)

Plaintiff paid the new price without protest and requested no further information.

There was no further price raise until January, 1944, when defendant notified plaintiff that there had been an actual increase in cost of manufacture of 78 cents and that the price per ton was accordingly being raised to $3.76. Plaintiff replied with a request for a description of the accounting basis for each classification of cost and asked whether it had been consistently followed since the inception of the contract. Defendant stated that it had, and provided information showing an allocation of general plant overhead and indirect costs in addition to the direct costs of producing the gypsum. Plaintiff objected to such allocation and the resultant controversy culminated in this litigation. The situation was not changed by a third price increase to $4.62 per ton in November, 1946.

This is a long-term contract in which each party sought to protect itself. Plaintiff secured the sole cancellation right. Without a price protection clause defendant might well find the contract ruinous. Bearing in mind the background of negotiations and Barrow's testimony, uncontradicted by Colton, that he was unwilling to relinquish his cancellation right and at the same time limit his costs to those items directly chargeable to the gypsum production, it seems clear to the court that when the parties used the term "cost of production" they intended it to include all costs that might be shown by accepted accounting practice. The parties' conduct with reference to the first price raise supports this conclusion. It is difficult for the court to believe that plaintiff's accountant in checking over defendant's figures for the express purpose of determining whether a price increase was justified would ignore the fact that one-sixth of such increase resulted from an increase in indirect costs.

The term "cost of production" is indefinite only in the sense that its determination must be had by reference to defendant's

accounting records. These, the contract provides and the evidence shows, are open to plaintiff. Applying the principle that "that is certain which may be made certain," the court holds that the contract is not invalid for uncertainty.

Much of the foregoing discussion is applicable to plaintiff's contention that "cost of production" refers only to "actual" or "direct" costs. This contention is based largely on the contract designation of gypsum as a "by-product," plaintiff taking the position that proper accounting practice charges to a by-product only those cost items incurred after its separation from the material of the main product. This position is not supported by the evidence, which shows that accepted accounting practice may charge to a by-product a proportionate share of indirect and overhead as well as the direct costs. Defendant has a uniform accounting system for all its plants. The record discloses that the cost records, upon which price increases could be based, were to be kept in accordance with proper and accepted accounting practice. Since the plaintiff has failed to prove that defendant's records were not so kept and that the price raises, consequently, were unjustified, the court concludes that defendant's method of determining its cost of producing gypsum is in accordance with the terms of the contract.

The remaining two provisions the court is asked to construe are clear from the plain language of the contract. Paragraph (3) gives plaintiff the right to refuse to purchase and accept in excess of 2000 tons of gypsum in any one month, or 20,000 tons in any one year. Defendant maintains that if plaintiff fails to refuse in excess of 20,000 tons, it loses the right to refuse in excess of 2000 tons in any one month. Plaintiff treats these as separate and distinct rights. In the contract each is set forth in a separate paragraph; when both are referred to, it is in the disjunctive. Plaintiff's position is correct.

Paragraph (5) deals with the gypsum specifications and gives plaintiff the option, if the gypsum shall not be within 2 per cent of such specifications, either to refuse to accept and pay for such gypsum, or to accept it and pay therefor ten cents per ton less for each per cent which the said gypsum falls below such specifications. The question is whether plaintiff may deduct a fraction of ten cents for each fractional per cent that the gypsum falls below the contract standard. The simple language of the contract requires a negative answer. This agreement was carefully drawn by able counsel. It seems obvious that if the parties had wished to allow fractional deductions for fractional percentages, the contract would have so specified.

Plaintiff has also asked the court to declare the proper method of taking gypsum samples for analysis. Since gypsum is shipped and stored in bulk, a composite sample taken from the aggregate quantity shipped each day will provide a fair analysis of the quality of such shipment.

Findings of fact, conclusions of law and judgment have heretofore been filed. This memorandum has been prepared to indicate the reasons for the court's decision.